# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re<br><br>**OYOTOYO, INC,** *et al.,*<br><br>Debtors | Chapter 11<br><br>Case No. 17-41261-EDK<br>(Jointly administered) |

## DECLARATION OF THOMAS SKRIPPS IN SUPPORT OF FIRST DAY MOTIONS

1. My name is Thomas Skripps. I am over 21 years of age and competent to make this Declaration. I have personal knowledge of all facts stated in this Declaration, and they are all true and correct, except for facts stated upon information and belief, and as to those facts I believe them to be correct.

2. I am the sole holder of common stock and the sole director of Oyotoyo, Inc. ("**Oyotoyo**"). I am an officer and the sole director of OYO Sportstoys, Inc. ("**OYO Sports**" and collectively with Oyotoyo, the "**Debtors**").

### BACKGROUND

3. On July 30, 2017 (the "**Petition Date**"), OYO Sports filed a petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Massachusetts (the "**Court**"). Oyotoyo, Inc. filed a petition for relief under Chapter 11 of the Bankruptcy Code on July 11, 2017 (the "**Oyotoyo Petition Date**") filed in this Court that is styled and numbered case number 17-41261-EDK, *In re Oyotoyo, Inc.* The Debtors continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### OYO Sports' Business

*A. Background*

4. OYO Sports is a corporation organized under the laws of the State of Delaware with its principal places of business in Hudson, Massachusetts. OYO Sports is a leading fan engagement company in the sports consumer marketplace, targeting the youth, fan and collector markets with both physical and digital toy products. OYO Sports creates buildable minifigures that are designed as the replica of athletes, with facial and uniform representation of their real life counterparts of major professional sports teams such as Major League Baseball, National Football League, National Basketball Association and over 60 major colleges and universities and more. Each OYO Sports minifigure comes with his own stand and unique DNA number, as well as rotating arms, bending knees, and the ability to hold a bat, stick, glove and ball.

5. OYO Sports is owned by Oyotoyo which owns 100% of the outstanding stock of OYO Sports. Oyotoyo, in turn, is owned by approximately 31 shareholders holding various amounts of different classes of preferred and common stock.

6. The Debtors historically have operated as a combined entity, with all of the Debtors' combined business activities performed by OYO Sports. Oyotoyo has no operations. Oyotoyo, however, is the licensee under various trademark and similar licenses with various professional sports leagues and players associations ("**Licenses**"). OYO Sports manufactures toys bearing the likenesses of professional athletes pursuant to those Licenses. Most of the Licenses are unexpired as of the Oyotoyo Petition Date. Other than a claim for professional services owed to a law firm, and monies owed to an insider and another third party (in the aggregate approximately $87,500) for monies advanced, Oyotoyo has no known liabilities to non-insiders other than for monies owed to the licensors under the Licenses. Similarly, Oyotoyo has no known assets other than (i) a bank account with approximately $300, and (ii) its interests

in the Licenses and an intercompany claim against OYO Sports for monies advanced from time to time to OYO Sports to support OYO Sports' operations in an amount estimated to be approximately $2,000,000, and additional amounts for pass-through liabilities for the royalties due under the Licenses.[1] In the aggregate, the total amount due from OYO Sports to Oyotoyo as of the Petition Date is approximately $3,966,634.04.

### B. *OYO Sports' Capital Structure*

7.    OYO Sports capital structure is relatively straightforward. On the liability side, in addition to the intercompany obligation to Oyotoyo referenced above, OYO Sports has sold its prepetition accounts receivable to its factor (Liquid Capital Exchange, Inc., hereinafter "**LC**"), and thus has claims from time to time against LC for the unpaid purchase price from LC. The basis of the factoring arrangement is set forth in a "*Purchase and Sale Agreement*" between LC and OYO Sports dated August 5, 2016, as amended by amendment dated August 12, 2016, and as modified as of the Petition Date (collectively, the "**Agreement**"). A genuine copy of the Agreement (including the amendment and modification) is attached as **Exhibit C-E** to the "DIP Motion" (as defined below). LC has a security interest in substantially all of OYO Sports' assets to secure amounts owed to it under the Agreement. Under the advance formula in the Agreement as modified, LC will advance to OYO Sports on account of the purchase price for postpetition receivables an amount equal to 80% of the face amount of the receivable, less LC's fee of 3.5%, resulting in an initial advance to OYO Sports of 76.5% of the face amount of the receivable. LC holds 20% of the receivable in a reserve, pending collection of the receivable. LC holds this reserve to protect itself in the event a customer fails to pay timely on account of a

---

[1] Although Oyotoyo is the licensee under the Licenses, all of the operations occur at the OYO Sports level, and thus OYO Sports is the source of payment of all royalty payments made to the licensees under the Licenses.

3

factored receivable. LC makes a further advance of the 20% held back and held in reserve if the customer pays the receivable in full and timely.

8. This arrangement results in amounts owed to LC (representing 80% of the face amount of uncollected receivables), and also amount due to OYO Sports from LC (representing the 20% held in reserve and paid upon receipt by LC of the full amount of each factored account receivable). Subject to final reconciliation, As of the Petition Date, OYO Sports was indebted to the LC in the amount of $486,179.23, the face amount of accounts purchased by LC from OYO Sports, less OYO Sports's adjusted reserves, which totaled $97,443.22 as of the Petition Date, and less any amounts subsequently collected LC, plus fees and costs as provided by the Agreement (as reconciled, the "**Pre-Petition Obligation**").

9. As discussed in detail below, OYO Sports also is obligated to Mr. Martin Hanssmann, an officer of OYO Sports and a shareholder of Oyotoyo, both for prepetition secured and unsecured debts. Prior to the Petition Date, Mr. Hanssmann made a secured loan to OYO Sports up to the amount of $150,000, secured by a security interest in substantially all of OYO Sports's assets, junior only to the security interest granted to LC. Mr. Hanssmann also intends, subject to approval of this Court, to advance further sums to OYO Sports subject to a postpetition lien, all as set forth in the DIP Motion and below. As of the Petition Date, Mr. Hanssmann has advanced the principal sum of $118,826.64 to OYO Sports pursuant to the "Hanssmann Loan Documents" (as defined below), true and correct copies of which are attached as **Exhibits F-H** to the DIP Motion.

10. In addition, as discussed in detail below, Mr. Hanssmann allowed OYO Sports to make purchases on his personal credit cards on an unsecured basis prior to the execution of the

4

Hanssmann Loan Documents. OYO Sports owes Mr. Hanssmann 78,548.82 as an unsecured debt for reimbursement for charges on his personal credit cards for OYO Sports's benefit,

11. On the asset side, in addition to the amounts in the LC reserve, OYO Sports also has on its books approximately $1,344,000 of inventory as of the Petition Date in the form of raw materials (inclusive of bulk molded parts and bagged sets) and finished goods. The finished goods value includes the raw material and labor used to produce the products. OYO Sports has the furniture, fixtures and equipment it uses in its operations and potential claims against third parties. By far the Debtors' most significant assets, however, is their combined goodwill and the value of Oyotoyo's interests as licensee under the Licenses.

### C. *The Circumstances Leading to the Filing of These Cases*

12. The Debtors filed their cases because of debts it incurred that were associated with a failed private equity transaction. In 2014, OYO Sports was growing rapidly and was experiencing exceptionally favorable responses and increased demand for its products from its customers. OYO Sports required substantial capital quickly to finance this growth surge to scale its business to meet this increased demand. To raise funds needed to finance this growth, OYO Sports issued a controlling block of equity to a group of private equity investors. That transaction ultimately was a failure. Although OYO Sports incurred substantial equipment lease and other debt obligations to ramp up its operations, OYO Sports never achieved the level of sales necessary to support this newly incurred overhead. Moreover, the transaction resulted in operational missteps. For example, shortly after the closing of the private equity transaction, the private equity firms demanded that I resign as President of OYO Sports. The private equity firms struggled with securing competent and focused new management. Accordingly, throughout 2015, OYO Sports struggled and continued to incur substantial debts and overhead.

In 2016, the equity firms wanted to exit the transaction. The equity firms and I agreed that my new investors and I would reacquire OYO Sports. Through a complicated transaction, Oyotoyo acquired OYO Sports in April 2016, and my new investors (the so-called "Series B" preferred shareholders) and I reacquired control of the Debtors.

13.     After we reacquired OYO Sports, it achieved immediate success and enjoyed positive EBIDTA in the fourth quarter of 2016. However, a new problem arose - a severe downturn in the retail environment, starting in February 2017, that left OYO Sports with reduced sales volume and struggling to cover its current overhead based on its reduced sales volume.

14.     The Debtors have filed their respective bankruptcy cases to address their debts and restructure their financial affairs. OYO Sports began prior to the Petition Date, and intends to continue, efforts to significantly reduce overhead, and believes it now has achieved both profitability and positive EBITDA from its operations. OYO Sports has moved to a new, smaller location in Hudson, Massachusetts that has reduced its monthly rent expenditure from approximately $70,000 to approximately $6850 in base rent and approximately $4000 per month in common area maintenance, taxes and similar charges. OYO Sports has moved the equipment it needs for continued operations to its new location. OYO Sports is in active discussions with strategic partners to provide exit liquidity and financing. The Debtors anticipate they will be in a position to file and seek confirmation of a feasible chapter 11 plan upon the conclusion of these discussions.

15.     The Debtors have filed the motions described below (the "**First Day Motions**"). I support allowance of the First Day Motions, and specifically note the following with respect to the First Day Motions.

   **D.  *Motion for Joint Administration***

16. In this Motion, the Debtors move the Court for the entry of an pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1(a) and (c) of the Local Bankruptcy Rules of the United States District Court for the District of Massachusetts directing the joint administration of their respective bankruptcy cases. Upon information and belief, the Debtors are "affiliates" as that term is defined under Section 101(2) of the Bankruptcy Code. The Debtors request joint administration for procedural purposes only. In my opinion, the approval of this motion will dispense with otherwise unnecessary and potentially duplicative filings, easing the administrative burden on the Court and all creditors and parties in interest. The Debtors request that this Court designate the case captioned as *In re Oyotoyo, Inc.*, docket number 17-41261-EDK, as the lead case in these bankruptcy proceedings. I am not aware of any facts that would give rise to actual or potential conflicts of interest caused by joint administration. The Debtors are not seeking substantive consolidation of the Chapter 11 cases through this motion. The rights of the Debtors' respective creditors will not be prejudiced by the entry of an order directing the joint administration of these cases.

17. To the extent that proofs of claim are required to be filed, each creditor will be required to file a claim against the particular estate that is indebted to such creditor. The Debtors will keep separate books and records and account for the assets and liabilities of each of their respective estates.

E. ***OYO Sportstoys Inc.'s Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (I) Authorizing OYO Sporstoys, Inc. to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Replacement Liens, (IV) Granting Adequate Protection, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief" (the "*DIP Motion*")***

18. OYO Sports is operating under severe financial and operational distress that threatens its ability to maintain operations. Put simply, OYO Sports currently is in a state of crisis. OYO Sports is out of cash and needs liquidity to survive and restructure its affairs. OYO

Sports believes its new overhead structure will enable it to maintain positive EBITDA and profitability going forward. Indeed, the profits OYO Sports believes it will generate, together with exit financing OYO Sports believes it can obtain, will be used by OYO Sports to produce a meaningful distribution to holders of allowed claims in this case. It needs cash now, however, to "prime the pump" before revenues from operations and LC are received. Without the infusion of new operating capital to fund operations and professional expenses of this Chapter 11 case, OYO Sports may not survive and this case is at risk of conversion to chapter 7. Conversion would be a tragedy and will likely result in substantial loss of value, resulting in creditors receiving little, if any, recovery.

19. OYO Sports submits that the relief sought in the DIP Motion is necessary and in the best interests of OYO Sports's estate in order to prevent immediate and irreparable harm to OYO Sports's estate that would result in the absence of the proposed financing. I believe that without the proposed financing, OYO Sports will not have the cash necessary to fund these chapter 11 cases or pay for services and expenses necessary to preserve and maximize the value of OYO Sports's business while OYO Sports seeks to effectuate a restructuring pursuant to a chapter 11 plan in this case. I believe that OYO Sports's contemplated plan, if confirmed, will maximize the recovery for creditors in this bankruptcy case. OYO Sports negotiated the financing for which approval is requested in this Motion to provide it with much-needed capital and liquidity during this chapter 11 case.

20. Pursuant to the DIP Motion, OYO Sports seeks entry of interim and final order (i) authorizing OYO Sports to (a) enter into a postpetition factoring and financing arrangement with LC, (b) enter into a postpetition financing arrangement with Mr. Hanssmann, on the terms and conditions set forth in the "*Loan Agreement*" dated July 11, 2017 attached to the DIP Motion as

8

Exhibit F, and the accompanying "*Promissory Note*" attached to the DIP Motion as Exhibit G and "*Security Agreement*" attached to the DIP Motion as Exhibit H (collectively, Exhibits F-H referred to as the "**Hanssmann Loan Documents**"), (c) authorize OYO Sports to obtain credit, on an unsecured administrative expense basis, from Darryl McKay, an employee of OYO Sports who will make purchases for OYO Sports on his personal credit card; (d) use Cash Collateral (as defined in the DIP Motion), (ii) granting replacement liens to LC and Mr. Hanssmann respectively, (iii) granting adequate protection to LC and Mr. Hanssmann respectively with respect to the use of the Cash Collateral and any diminution in the value of their interests in the prepetition collateral, including Cash Collateral.

21.     In summary, OYO Sports seeks approval of three complementary postpetition financing arrangements – a postpetition factoring arrangement that essentially permits OYO Sports to continue its prepetition factoring arrangement with LC during the postpetition period, postpetition secured financing from Mr. Hanssmann that provides OYO Sports with liquidity needed to fund professional fees and other expenses and postpetition unsecured credit from Darryl McKay, an employee of OYO Sports, who will use his personal credit card to buy materials for OYO Sports to use to manufacture its products. LC and Mr. Hanssmann (the "**DIP Lenders**") also will be granted postpetition liens on the same assets on which they enjoy a prepetition lien – essentially a lien on all of OYO Sports's assets. LC's lien will be a first priority lien. Mr. Hanssmann's lien will junior only to the lien to LC. The DIP Motion more fully describes the material terms of the proposed financing as required Bankruptcy Rule 4001(c), which I believe accurately summarizes those terms.

22.     With respect to Mr. Hanssmann, prior to the Petition Date, Mr. Hanssmann (i) provided OYO Sports with the use of his personal credit card, make payments to suppliers and

9

other vendors necessary to maintain OYO Sports's operations, and (ii) a prepetition secured loan, based on a combination of cash advances and use of his credit card. As of the Petition Date, Mr. Hanssmann had advanced the principal amount of 118,826.64 on his secured loan, and had an unsecured claim of 78,548.82 for other amounts incurred on his personal credit card for the benefit of OYO Sports.  Prior to the Petition Date, OYO Sports from time to time made payments on account of those credit cards.  As of the Petition Date, the total amount owed to Mr. Hanssmann on account of his credit card purchases for OYO Sports was $96,025.46.  Of this amount, $78,548.82 was unsecured, and treated as an employee expense, and the remaining $17,476.64 was part of the aforementioned secured loan.  The secured loan is pursuant to a secured financing arrangement between Mr. Hanssmann and OYO Sports that was dated as of July 11, 2017.[2]  The total amount available under Mr. Haussmann's secured loan to OYO Sports is $150,000, and it is secured by a security interest in substantially all of OYO Sports's assets, junior only to the security interest granted to LC. As noted above, as of the Petition Date, Mr. Hanssmann had advanced the principal amount of 118,826.64 on his secured loan t to OYO Sports, comprised of the following:

---

[2] These secured credit card purchases were made after July 11, and are as follows:

| 7/11/2017 | Record Martin H's July expenses to Date | 1,513.73 |
| 7/11/2017 | Payment to Superior on Martin's CC 7/19/17 | 3,635.92 |
| 7/11/2017 | Payment to Butler Dearden on Martin's CC 7.24.17 | 479.71 |
| 7/11/2017 | Martin's H's July credit card charges #2 | 1,847.28 |
| | | 7,476.64 |

| Date of Disbursement | Amount | Use of Funds |
| --- | --- | --- |
| 7/11/2017 | 12,000.00 | Payment of Oyotoyo's filing and lawyer fees |
| 7/12/2017 | 29,000.00 | Funding for payroll for week ending 7.14.17 |
| 7/14/2017 | 1,000.00 | Payment to Seb for work done 7.14.17 re: office move |
| 7/14/2017 | 3,700.00 | Payment of Unique invoice regarding mold shipment |
| 7/26/2017 | 20,650.00 | Rent and security deposit for Hudson office |
| 7/26/2017 | 25,000.00 | Payment for Oyo Sports filing and lawyer fees |
|  | 7,476.64 | Purchases on credit card for Oyo Sports |
|  | 20,000.00 | Miscellaneous Advances prior to petition date |
|  | 118,826.64 |  |

23. Mr. Hanssmann also intends, subject to approval of this Court, to advance further sums to OYO Sports subject to a postpetition lien. Pursuant to the Hanssmann Loan Documents, the advances either will be in the form of cash advances or by using Mr. Hanssmann's personal credit card. Pursuant to the Budget, during the budget period, OYO Sports intends to pay to Mr. Hanssmann the sum of $51,779 for application to interest and principal due on his personal credit cards used for OYO Sports's benefit, and in return will obtain additional secured financing of in the form of new purchases on his credit card of approximately $91,000. More importantly, OYO Sports obtains the use of his credit card, which provides an additional source of financing. As set forth in the Budget, OYO Sports lacks the cash to fund the necessary purchases without using the credit Mr. Hanssmann is making available.

24. With respect to Mr. McKay, OYO Sports also relies on the use of Mr. McKay's credit card to purchase needed materials and for other operating expenses. As of the Petition Date, OYO Sports's books and records indicate that Mr. McKay was owed the sum of $78,400.43 for the purchases made for OYO Sports's behalf on his personal credit card. Mr. McKay is prepared to continue allowing OYO Sports to have access to the credit available under his personal credit cards. As set forth in the Budget, during the budget period OYO Sports intends to pay to Mr. McKay the sum of $75,000, for application to interest and principal due on

his personal credit cards used for OYO Sports's benefit, and in return OYO Sports will obtain additional unsecured financing in the amount of $91,000. This credit will be in the form of continued usage of Mr. McKay's personal credit card, which, as with the use of Mr. Hanssmann's credit card, provides a critical source of liquidity in the first 90 days of OYO Sports's bankruptcy case.

25. OYO Sports engaged in good faith negotiations with LC, Mr. Hanssmann, and Mr. McKay to produce the postpetition liquidity facilities that are the subject of this Motion. The complementary postpetition financing transactions are intended to provide OYO Sports with sufficient liquidity to execute the necessary "pump priming" and ensure OYO Sports retains the prospects of preserving its value for its bankruptcy estate. The LC factoring will provide Oyo Sports will sufficient liquidity to enable it to fund its ongoing operations. The postpetition financing from Mr. Hanssmann will enable to the Debtors to fund a portion of the anticipated professional and other administrative fees required in this case. The budget attached to the DIP Motion describes the sources and uses of cash during the 13 days following the Petition Date.

26. OYO Sports is unable to obtain, on an unsecured general administrative priority basis, a loan of the magnitude needed cover its needs. OYO Sports has no assets, other than its accounts receivable, on which any commercial lender was prepared to lend the amounts necessary to fund operations as set forth in the Budget. Moreover, any new lender would demand a "priming lien" over the prepetition security interest granted to LC.

### F. *Motion to Pay Prepetition Wages, Salaries, Expenses, and Benefits*

27. By this motion, OYO Sports seeks entry of an order authorizing, but not directing, OYO Sports to pay its employees' prepetition wages, salaries, expenses, and benefits as set forth below, in an amount not to exceed the priority caps set forth in Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. OYO Sports also requests the authority to pay taxes associated with

such wages and salaries, pay benefit claims accruing in favor of their employees, and to use existing payroll accounts and business forms.

28. OYO Sports requests this relief to ensure that the prepetition payroll is paid and honored in the ordinary course of business. OYO Sports and its bankruptcy estate will suffer immediate and irreparable harm absent the requested relief. Absent payment of wages, OYO Sports will suffer disruption due to the loss of employees and/or harm to employee morale if it is unable to pay the prepetition wages in the ordinary course of business. . A true and correct list of the amounts to be paid to each employee pursuant to this wage motion is set forth on Exhibit A attached to that motion.

29. Oyotoyo has no employees. Accordingly, the relief requested pursuant to this Motion only concerns employees of OYO Sports. OYO Sports seeks authority to pay or have honored any outstanding wages, salaries and benefits owed to its employees on the Petition Date (collectively, the "Prepetition Wage Obligations") in the usual and ordinary course of business.

30. OYO Sports has salaried and non-salaried employees. The mechanics of paying each group is slightly different. Salaried employees are paid weekly on a current basis. OYO Sports sends the funds to pay salaried employees to its payroll processor (ADP) on the Wednesday of each week. ADP then pays salaried employees on Friday of each week largely, if not entirely, by direct deposit into each employee's personal bank account.

31. As of the Petition Date, OYO Sports has no unpaid salaried employees, as all salaried employees were paid their ordinary payroll on Friday, July 28, 2017, the last business day prior to the Petition Date.

32. The non-salaried employee payroll is different. Under OYO Sports' standard payroll procedures, non-salaried employees are paid weekly in arrears. The pay period ends on

the Tuesday of each week. On the next day (Wednesday of each week), OYO Sports funds it payroll by transmitting to its payroll processor the funds necessary to pay the weekly payroll. On the Friday of each week, the payroll processor remits payments to employees largely, if not entirely, by direct deposit into each employee's personal bank account.

33. As of the Petition Date, OYO Sports's non-salaried employees who must be paid on the Friday following the Petition Date, and the amount of prepetition wages paid and allocable to each, is attached as Exhibit A to the wage motion.[3] The total amount of gross Prepetition Wage Obligations (inclusive of applicable taxes) OYO Sports seeks to pay to or for the benefit of their non-salaried employees $2573.33, or approximately $257.33 on average per employee. This total amount consists of accrued but unpaid wages, salaries and benefits (inclusive of applicable taxes) as of the Petition Date. As illustrated on Exhibit A, no non-salaried employee will receive an amount in excess of the $12,850 priority cap set forth in Section 507(a)(4) of the Bankruptcy Code.

34. As of the Petition Date, OYO Sports has deducted from the employees' paychecks certain payments on behalf of payroll taxes and the employees' portions of FICA and FUTA, legally ordered wage garnishments and/or domestic support obligations, among others (collectively the "Deductions"). In the ordinary course of business, the Deductions are paid to third parties in accordance with applicable law. The employee portion of the Deductions may constitute trust funds that are not property of OYO Sports's bankruptcy estates. In any case, the relevant taxing authorities would hold a priority claim under Section 507(a)(8) of the Bankruptcy Code for the tax portion of the Deductions. As a result, creditors will not be prejudiced by the

---

[3] To preserve confidentiality of the employees and the personally identifiable information of each that includes sensitive information about each employee's earnings, Exhibit A does not identify the individual employees by name. Instead, the employees are listed as "Non-Salaried employee 1, 2, 3, etc."

payment of the Deductions or the payment of the employer portions of the FICA and FUTA taxes associated with the prepetition payroll. Accordingly, OYO Sports requests authority to pay the Deductions in the ordinary course of their business.

35. OYO Sports provides 80 hours of paid vacation for employees per year. OYO Sports also provides up to 40 hours of sick pay for employees per year. No employee will receive cash on account of vacation pay, but instead OYO Sports requests the authority to honor, in the ordinary course of business, earned but unused vacation time and/or sick leave for employees that accrued prior to the Petition Date.

36. OYO Sports customarily reimburses its employees who incur a variety of business expenses in the ordinary course of performing their duties. These reimbursable expenses include, among other expenses, those incurred in connection with travel, long-distance telephone charges, cellular phone charges, contract labor, shipping charges, software service charges, and other charges requiring credit cards to process transactions. In some instances, employees may use personal credit cards for which the employee pays the bill and upon submission of the receipt, is then reimbursed by OYO Sports. Because the employees do not always submit claims for reimbursement promptly, it is difficult for OYO Sports to determine the exact amount outstanding at any particular time to other employees. OYO Sports also seek authority to continue to reimburse their employees for such current expenses on a post-petition basis, in accordance with its prepetition practices.[4]

37. OYO Sports have established a health plan and dental plan that is administered by Lively Insurance (the "Health Plan"). OYO Sports pays monthly premiums under the Health

---

[4] Martin Hanssmann and Daryl McKay have significant balances owed to them for use of their personal credit cards. Payments to them on account of these credit cards are dealt with separately in OYO Sports's motion for postpetition financing.

15

Plan and also pay the direct employee health claims, less any deductibles or co-pays paid by employees. OYO Sports estimates that the average total weekly cost of the Health Plan is approximately $3,336. OYO Sports estimates that it does not owe any amounts and was current for the costs of or on account of claims under the Health Plan through the Petition Date

38. OYO Sports pay workers' compensation insurance on behalf of their employees (collectively with the Health Plan, the "Employee Benefits"). OYO Sports seeks authority to pay any prepetition amounts that may be owed on account of the employer contribution to the Employee Benefits, which contribution is included in the calculations of the Prepetition Wage Obligation set forth above. The proposed payments will not exceed the statutory ceiling set forth in Section 507(a)(5) of the Bankruptcy Code.

### G. *Motion to Reject Unexpired Equipment Leases*

39. As of the Petition Date, OYO Sports was the lessee under, inter alia, the equipment leases identified on **Exhibit A** attached to this Motion (the "**Surplus Equipment Leases**"). OYO Sports no longer has any need or use for the pieces of equipment that are the subject of the Surplus Equipment Leases. OYO Sports wishes to reject the Surplus Equipment Leases to eliminate its potential obligation for postpetition rental payments or similar adequate protection payments under the Surplus Equipment Leases.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 27, 2017

*Thomas Skripps*