**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **OYOTOYO, INC**, *et al.*, | **Case No. 17-41261-EDK** |
| **Debtors** | **(Jointly administered)** |

**DEBTORS' MOTION FOR (I) ORDER APPROVING BREAK-UP FEE, MINIMUM
OVERBIDS, ESTABLISHING BIDDING PROCEDURES, AND GRANTING RELATED
RELIEF, AND (II) ORDER APPROVING SALE OF SUBSTANTIALLY ALL ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS
AND GRANTING RELATED RELIEF**
*(Expedited Consideration Requested)*

OYO Sportstoys, Inc. (**OYO Sports**") and Oyotoyo, Inc. ("**Oyotoyo**", and with OYO

Sports, the "**Debtors**") file this motion (the "**Motion**") and seek entry of an order, substantially

in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) approving the

proposed break-up fee (the "**Break-Up Fee**") described below, (ii) approving the proposed

minimum bid increment described below, (iii) approving the bidding procedures described below

(the "**Bidding Procedures**") by which the Debtors will solicit and select the highest or otherwise

best offer for the sale (the "**Sale**") of substantially all of the Debtors' assets, (iv) approving the

form and manner of notice to be provided in connection with the Sale, (v) scheduling a final

hearing (the "**Sale Hearing**") to approve the Sale to the winner bidder, and (vi) granting related

relief. ***The Debtors respectfully request that the Sales Procedures Order be considered at a***

***hearing at the earliest available date on the Court's calendar during the week of February 19,***

***2018***. The Debtors further request that, at the subsequent Sale Hearing, this Court enter an order

(the "**Sale Order**"), which will be filed before the Sale Hearing: (i) authorizing the sale of

Debtors' assets free and clear of liens, pledges, security interests, charges, options, claims,

encumbrances, and other interest (collectively, the "**Interests**") to the winning bidder, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, if any, and (iii) granting related relief.  IN support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.     After months of effort, the Debtors have achieved agreement with a third party to act as a "stalking horse" bidder for the Sale and to support a subsequent chapter 11 plan ("**Plan**") pursuant to which the stalking horse buyer has agreed to acquire all of the stock of the Debtors. The Debtors' creditors will have an opportunity to achieve a meaningful recovery under the contemplated plan, which the Debtors contemplate will be confirmed during the summer of 2018.

2.     Beginning shortly after the commencement of the Debtors' cases in July 2017, the Debtors have engaged in a substantial solicitation effort, both among the Debtors' competitors in their market who may be interested in a strategic purchase and among potential financial buyers. The result of this effort is the "Binding Letter of Intent" ("**LOI**") among the Debtors and 9135-3904 Québec Inc. d/b/a/ Imports Dragon ("**Imports Dragon**") attached as **Exhibit B**.  Pursuant to the LOI, Imports Dragon has agreed to purchase substantially all of the Debtors' operating assets, and certain preference claims, for the sum of $500,000 ("**Cash Consideration**"). Additionally, Imports Dragon has agreed to pay the cure costs associated with any executory contracts it elects to assume.

3.     Imports Dragon also has agreed to support a contemplated Plan, pursuant to which the Debtors will (i) cancel all existing stock and issue new stock in the reorganized Debtors to Imports Dragon, thereby making Imports Dragon the sole shareholder of the Debtors,

2

(ii) establish a trust for the benefit of creditors, the trustee of which will pursue litigation claims,

including the Debtors' substantial claims against The Bridge Direct, Inc. and its affiliate The

Bridge Direct (HK) Ltd., a Hong Kong company (collectively, "**Bridge**") and the Debtors'

avoidance actions not acquired by Imports Dragon.  The Debtors' major creditors (largely

various trademark licensing entities of professional and college sports leagues and associations,

collectively, the "**Leagues**") have preliminarily indicated they intend to participate in the

proposed litigation trust, and some preliminarily have indicated interest in assigning certain

trademark infringement claims against Bridge for the litigation trustee to pursue.  The Leagues

also have preliminary indicated they approve of Imports Dragon to continue the Debtors'

existing business as their licensees.

    4.      The Sale and Plan transaction (collectively, the Sale and the Plan are referred to

as the "**Transaction**") have been subject to "market testing."  The Debtors have extensively

solicited interest in the Transaction from third parties and believe there is a possibility that

competing bidders may submit bids. A condition of the LOI is that the Debtors set a prompt

deadline for receipt of competing bids, and, if any are submitted, conduct an auction no later than

February 28, 2018, to allow Imports Dragon time prior to closing (which is expected to occur 28

days after entry of the Sale Order) to finalize negotiations with the Leagues prior to closing. [1]

The potential competing bidders have been made aware of the accelerated time of the Sale and

have indicated that they may be prepared to submit bids during the contemplated accelerated

bidding process.  The Bidding Procedures accommodate need for a prompt auction yet appear to

---

[1] Imports Dragon's obligations under the LOI are not conditioned in any respect on the outcome of these negotiations. Nevertheless, Imports Dragons insisted upon time prior to closing, beginning on or about March 1, 2018, to conduct these negotiations prior to closing, and the Debtors have agreed to accommodate this requested time frame, subject to this Court's approval of the definitive deadlines in the Bidding Procedures Order.

the Debtors to be sufficient to enable interested bidders to formulate and submit competing bids timely.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.  The Motion is a core proceeding pursuant to 2u U.S.C. §157(b).  The statutory predicates for the relief requested in this Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 6004, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and Rules 2002-1 – 2002-5, and 6004-1 of the Local Rules of this Court ("**MLBR**" or "**Local Rules**").

## OYO SPORTS' BUSINESS

### A.          *Background*

6.      The background of the Debtors is summarized in the first day "Declaration of Thomas Skripps" [Dkt. 2 in OYO Sportstoys case, Docket No. 17.41394-EJK] ("**Skripps Dec.**") OYO Sports is a corporation organized under the laws of the State of Delaware with its principal places of business in Hudson, Massachusetts.   OYO Sports is a leading fan engagement company in the sports consumer marketplace, targeting the youth, fan, and collector markets with both physical and digital toy products.  OYO Sports creates buildable minifigures that are designed as the replica of athletes, with facial and uniform representation of their real-life counterparts of major professional sports teams such as Major League Baseball, National Football League, National Basketball Association and over 60 major colleges and universities and more.  Each OYO Sports minifigure comes with his own stand and unique DNA number, as well as rotating arms, bending knees, and the ability to hold a bat, stick, glove, and ball.

4

7.       OYO Sports is owned by Oyotoyo which owns 100% of the outstanding stock of

OYO Sports.  Oyotoyo, in turn, is owned by approximately 31 shareholders holding various

amounts of different classes of preferred and common stock.

8.       The Debtors historically have operated as a combined entity, with all of the

Debtors' combined business activities performed by OYO Sports.  Oyotoyo has no operations.

Oyotoyo, however, is the licensee under various trademark and similar licenses with various

professional sports leagues and players associations ("**Licenses**").  OYO Sports manufactures

toys bearing the likenesses of professional and college athletes pursuant to those Licenses.  Most

of the Licenses are unexpired as of the Oyotoyo Petition Date.  Other than a claim for

professional services owed to a law firm, and monies owed to an insider and another third party

(in the aggregate approximately $87,500) for monies advanced, Oyotoyo has no known liabilities

to non-insiders other than for monies owed to the licensors under the Licenses.  Similarly,

Oyotoyo has no known material assets other than its interests in the Licenses and an

intercompany claim against OYO Sports for monies advanced from time to time to OYO Sports

to support OYO Sports' operations in an amount estimated to be approximately $2,000,000, and

additional amounts for pass-through liabilities for the royalties due under the Licenses.[2]  In the

aggregate, the total amount due from OYO Sports to Oyotoyo as of the Petition Date is

approximately $3,966,634.04.

**B. *OYO Sports' Capital Structure***

---

[2] Although Oyotoyo is the licensee under the Licenses, all of the operations occur at the OYO Sports level, and thus OYO Sports is the source of payment of all royalty payments made to the licensees under the Licenses.

9.     OYO Sports capital structure is relatively straightforward.  Oyotoyo has no secured creditors.  There are three entities asserting liens and security interests in OYO Sports' assets, as follows:

   a.  <u>Liquid Capital Exchange, Inc.</u>:  OYO Sports has sold its accounts receivable to its factor (Liquid Capital Exchange, Inc., hereinafter "**LC**"), and thus has claims from time to time against LC for the unpaid purchase price from LC. The Court previously entered orders authorizing and approving the postpetition factoring of OYO Sports' accounts receivable to LC (<u>See</u>, Dkt. No's 33, 74).  LC has a security interest and postpetition lien in substantially all of OYO Sports' assets to secure amounts owed to it under the Agreement. LC holds 20% of the receivable in a reserve, pending collection of the receivable.  LC holds this reserve to protect itself in the event a customer fails to pay timely on account of a factored receivable.  LC makes a further advance of the 20% held back and held in reserve if the customer pays the receivable in full and timely.  The Debtors believe the amount of the reserve exceeds the amounts due to LC, and thus LC is substantially oversecured.

   b.  <u>Martin Hanssmann</u>:  Mr. Hanssmann is an officer of OYO Sports.  Prior to the Petition Date, Mr. Hanssmann made a secured loan to OYO Sports up to the amount of approximately, $150,000, secured by a security interest in substantially all of OYO Sportstoys' assets, junior only to the security interest granted to LC.

   c.  <u>Mars 2000, Inc.</u>:  Mars, 2000, Inc. ("**Mars**") is a corporation with operations in Rhode Island.  Mars is a supplier of parts to OYO Sports and manufactured

6

and uses certain molds for the production of parts ordered by OYO Sports. A *bona fide* dispute exists between Mars and the Debtors regarding the claims and liens asserted by Mars. Mars claims it is owed $131,236.11, and that this claim is secured on OYO Sports' molds in Mars' possession by a Rhode Island statutory lien pursuant to RI Gen Law §34-30.1-1, which provides Molders with a lien "on all dies, molds, forms or patterns in their possession belonging to a customer, for the balance due them from such customer for any manufacturing or fabrication work and the value of all material related to such work." OYO Sports contends that Mars' claim is not greater than $53,000 (and may be less). OYO Sports contends that any claim of Mars is at most a general unsecured claim, since any amounts owed to Mars arise from a contractual agreement, and not for the balance due "for any manufacturing or fabrication work" or for the value of materials related to such work.

### C. The Circumstances Leading to the Filing of These Cases

10.    The Debtors filed their cases because of debts they incurred that were associated with a failed private equity transaction. In 2014, OYO Sports was growing rapidly and was experiencing exceptionally favorable responses and increased demand for its products from its customers. OYO Sports required substantial capital quickly to finance this growth surge to scale its business to meet this increased demand. To raise funds needed to finance this growth, OYO Sports issued a controlling block of equity to a group of private equity investors. That transaction ultimately was a failure. Although OYO Sports incurred substantial equipment lease and other debt obligations to ramp up its operations, OYO Sports never achieved the level of sales necessary to support this newly incurred overhead. Moreover, the transaction resulted in

operational missteps.  For example, shortly after the closing of the private equity transaction, the

private equity firms demanded that Thomas Skripps resign as President of OYO Sports.  The

private equity firms struggled with securing competent and focused new management.

Accordingly, throughout 2015, OYO Sports struggled and continued to incur substantial debts

and overhead.  In 2016, the equity firms wanted to exit the transaction.  The equity firms and Mr.

Skripps agreed that the new investors and Mr. Skripps would reacquire OYO Sports.  Through a

complicated transaction, Oyotoyo acquired OYO Sports in April 2016, and the new investors

(the so-called "Series B" preferred shareholders of Oyotoyo.

11.    After the new investors and Mr. Skripps reacquired OYO Sports, it achieved

immediate success and enjoyed positive EBIDTA in the fourth quarter of 2016.  However, a new

problem arose - a severe down-turn in the retail environment, starting in February 2017, that left

OYO Sports with reduced sales volume and struggling to cover its current overhead based on its

reduced sales volume.  The Debtors filed these cases to resolve the issues arising from this

downturn.

## IMPORTS DRAGON'S STALKING HORSE BID

12.    As set forth in the Skripps Dec. (¶14), the Debtors have been in active discussions

with strategic partners to provide exit liquidity and financing.  The Debtors anticipate they will

be in a position to file and seek confirmation of a feasible chapter 11 plan upon the conclusion of

these discussions.  The Debtors have selected Imports Dragon to act as a stalking horse bidder.

Imports Dragon's website (www.importsdragon.com) states that it was founded by Stephan

Tetrault in 1998, and is a Canadian-based global toy manufacturer and distributor and has

become one of the fastest growing toy companies in Canada.  Headquartered in in Boisbriand,

Quebec, Imports Dragon also has offices in Toronto, Ontario; Deerfield Beach, Florida and

Shenzhen, China and employs over 80 dedicated staff.  According to Imports Dragon, its

headquarters boasts a 100,000 square foot warehouse which houses products and where global

logistics are managed from.  Imports Dragon asserts that its company's strengths lie in its

innovative product development, wide retail distribution and engaging marketing across all

brands. Imports Dragon holds the Global Master Toy license for multiple leading licenses and

has ancillary rights for additional licenses across core and proprietary product lines.

13.     Pursuant to the LOI, and subject to this Court's approval, Imports Dragon will

buy the "Purchased Assets" (as defined in section 1 of the LOI).  The Purchased Assets include

OYO Sportstoys' operating assets (inventory, equipment, raw materials, work in process),

business records, and contracts designated by Imports Dragon no later than the Auction, which

may include licenses from the Leagues (the "**Licenses**").  Under section A.1.d. of the LOI (at 3),

Imports Dragon is obligated to designate contracts it wishes to assume no later than the Auction

(the "**Designated Contracts**").  Similarly, competing bidders are obligated to provide with their

competing bids a list of Designated Contracts.  The "Winning Bidder" (as defined below, either

Imports Dragon or a competing bidder) has an opportunity for a limited period of time to

remove, but not add, contracts to the list of Designated Contracts after the Auction.  The

Winning Bidder is obligated to pay all cure costs and provide adequate assurance of future

performance as required by section 365 of the Bankruptcy Code with respect to all Designated

Contracts it does not timely remove from the list.[3]

---

[3] The Debtors contemplate that forthwith after the Auction they will file a motion to assume and assign the Designated Contracts to the Winning Bidder and to reject all other executory contracts and unexpired leases as of the Closing Date (the "**Executory Contracts Motion**").

14.     The significant non-operating asset Imports Dragon intends to acquire as part of the Purchased Assets are all potential preference claims against Mr. Hanssmann and Daryl McKay, two key employees Imports Dragon will attempt to hire after the Sale.  Imports Dragon is obligated to purchase these preference claims regardless whether Mr. Hanssmann and Mr. McKay become its employees after the Sale.  The transfer of these preference claims, however, will occur upon confirmation of the Plan, and not as part of the Closing.

15.     The Purchased Assets do not include the "Excluded Assets" (as defined in section A.1.a.vi., at 3).  The Excluded Assets include cash on hand, cash held in the LC reserve, certain enumerated refunds and credits and all avoidance actions other than the potential preference claims against Mr. Hanssmann and Mr. McKay.  Also, the Debtors are *NOT* selling any personally identifiable information the Debtors have collected through sales at the Debtors' website (the "**Information**"), as the sale of such information generally is controlled, and essentially prohibited, by section 363(b)(1) of the Bankruptcy Code.  OYO Sportstoys privacy policy prohibits the transfer of the Information.  Instead, as set forth below, the Information will remain with OYO Sportstoys, and as part of the Transaction, Imports Dragon will acquire all of the stock of the Debtors pursuant to a chapter 11 plan.

16.     The LOI requires (at ¶A.1.d.) that Imports Dragon deliver a $50,000 deposit to the Debtors.  Imports Dragon has delivered $49,980 of that deposit, and, upon information and belief, is delivering the remaining $20 of the deposit, to the Debtors.  The funds received and to be received are held by the undersigned counsel for OYO Sports in his IOLTA client's funds account.

10

## <u>PROPOSED BIDDING PROCEDURES</u>

17.     Subject to this Court's approval and entry of the Bidding Procedures Order

establishing definitive deadlines, the Debtors propose the following timeline for the Sale:

| Deadline | Action(s) |
|----------|-----------|
| Week of Feb. 19, 2018 | Bidding Procedures Order entered |
| Monday, Feb. 26, 2018 | Bid Deadline |
| Wednesday, Feb. 28, 2018 at 10:00 a.m. (Prevailing Eastern Time) | Auction |
| Thursday, March 1, 2018 at 4:30 p.m. (Prevailing Eastern Time) | Debtors file (i) Notice of Winning Bidder, and (ii) Motion to Assume and Assign Designated Contracts to Winning Bidder, and serve Contract Notice |
| Thursday, March 8, 2018 | Cure Amount and Adequate Assurance of Future Performance Objection Deadline<br><br>Sale Motion Objection Deadline |
| Week of March 12, 2018 | Sale Hearing |
| No later than 28 Days After Entry of Sale Order ("**Closing Date**") | Closing |

18.     The Debtors propose the following Bidding Procedures:

a.   <u>Bid Deadline</u>:  A qualified Bid for the Debtors' assets must be in writing and actually received on or before 5:00 p.m. prevailing Eastern Time on Monday, Feb. 26, 2018 (unless the Debtors agree to extend the deadline for some or all potential bidders).

b.   <u>Qualified Bids</u>:  A "Qualified Bid" is a bid that complies with all of the following:

i.   It includes a letter stating that the bid is irrevocable until the earlier of (i) the approval by the Bankruptcy Court of the Winning Bidder, and (ii) the conclusion of the Auction; <u>provided, however</u>, that if such bid

11

is selected as the highest or otherwise best Qualified Bid or the Backup Bid, it shall remain irrevocable until the closing of the Sale to the Winning Bidder or the Backup Bidder, as the case may be;

ii.   It includes a duly authorized and executed binding letter of intent ("**Proposed LOI**") specifying the purchase price, expressed in United States Dollars (the "**Proposed Purchase Price**") and identifying as "Designated Contracts" the executory contracts and unexpired leases to be acquired, if any, together with all exhibits and schedules thereto, and such ancillary agreements as may be required by the bidder with all exhibits and schedules thereto and the proposed orders to approve the Sale by the Bankruptcy Court;

iii.   The Proposed Purchase Price includes cash consideration ("**Proposed Cash Consideration**") of at least $535,000 (to cover the cost of the proposed Break-Up Fee and to provide a modest additional recovery to the estate from the competing bidder);

iv.   It does not include any request or entitlement to any breakup fee, expense reimbursement or similar type of payment;

v.   It is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining any financing capital and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

vi.   It fully discloses the identity of each entity that is bidding or otherwise that will be sponsoring or participating in the bid, including the identification of the bidders' direct and indirect owners and their principals, and the complete terms of any such participation;

vii.   It includes an acknowledgement and representation that the bidder (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets to be acquired and liabilities to be assumed in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the assets to be acquired or liabilities to be assumed or the completeness of any information provided in connection therewith, including by the Debtors, their professionals or any of their respective professionals and advisors, (iii) is a sophisticated party capable of making its own assessments in respect of making its bid; and (iv) has had the benefit of independent legal advice in connection with its bid;

12

viii. It includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the transaction contemplated by this Motion and Proposed LOI;

ix. It is accompanied by a refundable deposit (the "**Deposit**") in the form of a wire transfer (to the IOLTA account of OYO Sportstoys' counsel, in accordance with wiring instructions to be provided to competing bidders), or such other form acceptable to the Debtors, in an amount equal to 10% of the Proposed Cash Consideration, to be held and dealt with in accordance with these Bidding Procedures;

x. It (i) includes an acknowledgement and representation that the bidder will assume, if applicable, the obligations of each of the Debtors under the Designated Contracts; (ii) contains the bidder's agreement to pay the related cure costs; and (iii) indicates which of these executory contracts and unexpired leases, if any, the bidder must be permitted to assume as a condition of closing;

xi. It provides that the bidder shall agree to and perform the entire Transaction, including deferring transfer of the preference claims against Mr. Hanssmann and Mr. McKay until confirmation of a plan, supporting and participating in the Plan and assisting the Debtors as the Debtors request in obtaining confirmation of the Plan, achievement of the Effective Date under the Plan and the performance of all transactions contemplated by the Plan;

xii. it provides for closing of the Sale by no later than the Closing Date;

xiii. If the bidder is an entity newly formed for the purpose of the transaction, the bid shall contain an equity or debt commitment letter from the parent entity or sponsor, which is satisfactory to the Debtors, that names the Debtors as third-party beneficiaries of any such commitment letter with recourse against such parent entity or sponsor;

xiv. It includes evidence, in form and substance reasonably satisfactory to Debtors, of compliance or anticipated compliance with any and all applicable U.S. and foreign regulatory approvals;

xv. it contains other information reasonably requested by the Debtors, or their professionals or advisors;

xvi. it is received no later than the Bid Deadline.

c.  Return of Deposit:  All Deposits shall be retained by the Debtors.  If a Qualified Bidder becomes the Winning Bidder, the Deposit paid by the Winning Bidder whose bid is approved at the Sale Hearing shall be applied to the purchase price to be paid by the Winning Bidder upon closing of the Sale. The Deposit paid by the Backup Bidder, if there is a Backup Bidder, shall be retained until the closing of the Sale or, if the Backup Bidder becomes the ultimate purchaser pursuant to the Bidding Procedures, shall be applied to the purchase price to be paid by the Backup Bidder upon closing of the Sale.  The Deposits of all bidders not selected as having the highest or otherwise best Qualified Bid or selected as the Backup Bidder shall be returned to such bidders within twenty (20) business days of the entry of the Sale Order.  If the Bidding Procedures are terminated in accordance with the provisions thereof, all Deposits shall be returned to the bidders within five (5) business days of the date upon which the Bidding Procedures are terminated.  If an entity selected as the Winning Bidder (including, if selected as the Winning Bidder, the Backup Bidder) breaches its obligations to close, it shall forfeit its Deposit to the Debtors; ***provided, however***, that the forfeit of such Deposit shall be in addition to, and not in lieu of, any other rights in law or equity that any of the Debtors has or have against such breaching entity.

d.  Auction:  In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct an Auction.  Unless the Debtors announce a different time and place with notice to all entities submitting a Qualified Bid, the Auction will be conducted at the Boston offices of counsel to OYO Sportstoys, Jeffrey D. Sternklar LLC, at the 26th Floor, 225 Franklin Street, Boston, MA 02110 on February 28, 2018, commencing at 10:00 a.m. (prevailing Eastern Time) to determine the Winning Bidder.  Any bidder submitting a Qualified Bid may appear and submit its highest and best bid at the Auction.  The Auction may be adjourned by announcement at the Auction without further notice.

e.  Auction Procedures:  At the Auction, the Debtors will advise all Qualified Bidders of what they believe to be the highest or otherwise best Qualified Bid, together with any additional materials the Debtors have deemed appropriate and will inform each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.  Bidding at the Auction shall begin initially with the highest or otherwise best Qualified Bid announced by the Debtors and shall subsequently continue in a manner selected by the Debtors.  The Auction may be conducted by sealed bidding, open bidding, or a combination, all as determined by the Debtors at any time prior to the close of the Auction in their sole and absolute discretion.  All open bidding will occur in minimum increments of such amount the Debtors determine to facilitate the Auction most efficiently under the circumstances.  Bidding may continue until the Debtors determine that they have received the highest or otherwise best bid

14

for the assets.  After the Debtors make such determination, the Auction will be closed.  Each Qualified bidder shall be required to confirm that it has not engaged in any collusive behavior with respect to the bidding, the Auction, or the Sale.  At the Auction, a Qualified Bidder will be permitted to increase its bid only with the permission of the Debtors, which will be granted or withheld based upon the Debtors' determination in their sole and absolute discretion that a Qualified Bidder has the wherewithal to perform its bid if increased and that such proposed bid increase is in the best interests of the Debtors' bankruptcy estates.

f.   <u>Determination of Successful Bidder</u>.  The Debtors will determine and announce which Qualified Bid has been determined to be the Winning Bid. At the same time, the Debtors will identify a *next* highest or otherwise best Qualified Bid and announce that the bidder providing such bid has been selected as the "**Backup Bidder**" (the Backup Bidder's highest or otherwise best bid, the "**Backup Bid**").  If a Backup Bidder is identified in accordance with the Bidding Procedures, then the Backup Bid shall remain open until the closure of the Sale to the Winning Bidder.  In selecting the Winning Bid (and in determining the Backup Bid), the Debtors will review each Qualified Bid. Evaluation criteria may include, but are not limited to items such as: (a) the purchase price and the net value (including assumed liabilities and other obligations to be performed or assumed by the bidder) provided by such bid; (b) the claims likely to be created by such bid in relation to other bids; (c) other factors affecting the speed, certainty and value of the transaction (including any regulatory approvals required to close the transaction); (d) the assets included or excluded from the bid and the transaction costs and risks associated with closing multiple transactions versus a single transaction for all or substantially all of the assets; (e) the transition services required from the Debtors post-closing and any related restructuring costs, if any; and (f) the likelihood and timing of consummating the transaction by the Closing Date.

g.   ***THE DEBTORS SHALL HAVE THE RIGHT TO ALTER, AMEND, ADD, DELETE OR CHANGE ANY OR ALL OF THE FOREGOING BID PROCEDURES AT ANY TIME, AND THE DEBTORS SHALL ANNOUNCE FROM TIME TO TIME AT THE AUCTION ANY ADDITIONAL OR DIFFERENT BID PROCEDURES THAT MAY APPLY***

## PROPOSED NOTICE PROCEDURES

19.   In connection with the proposed sale, and subject to the Court's approval of definitive deadlines, the Debtors shall issue the following notices:

a. <u>Sale Notice</u>:  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall serve a sale notice, substantially in the form attached hereto as **Exhibit C** (the "**Sale Notice**"), electronically by electronic mail, by facsimile or by first class mail, postage prepaid, as determined by the Debtors, upon: (i) all entities reasonably known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets; (ii) all entities know to have asserted Interests against the Debtors' assets; (iii) parties to whom this Court previously directed notice be given, including the United States Internal Revenue Service and the Massachusetts Department of Revenue and (iv) any other entities as required by the Bankruptcy Rules or the Local Rules and any orders of this Court.

b. <u>Contract Notice</u>:  Simultaneously with service of any notice required with respect to the Executory Contracts Motion, the Debtors shall serve a notice of potential assumption and assignment of executory contracts and unexpired leases, if any, substantially in the form attached hereto as **Exhibit D** (the "**Contract Notice**"), upon all non-Debtor counterparties to the Designated Contracts.

## RELIEF REQUESTED

20.    By this Motion, the Debtors request entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Break-Up Fee, (ii) the Bidding Procedures; (iii) the form and manner of notices proposed herein; (iv) the scheduling of the Sale Hearing and related proposed deadlines; and (v) related relief.  At the Sale Hearing, the Debtors will also request entry of the Sale Order to approve the Sale to the Winning Bidder and for related relief, including with respect to the Backup Bidder.

## BASIS FOR RELIEF

### A.  The Break-Up Fee and Overbid Requirements are Warranted

21.    To compensate Imports Dragon for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtors seek authority for the Break-up Fee on the grounds set forth in the LOI.  Pursuant to section A.1.g. of the LOI, Imports Dragons is entitled to the Break-Up Fee if a sale of the Purchased Assets to Imports Dragon is not consummated,

16

other than as a result of a material breach of the LOI[4] by Imports Dragon, and the Debtors (or either of them) consummate any sale, purchase, reorganization or other disposition of the Purchased Assets or the equity in one or both of the Debtors under a chapter 11 plan of reorganization, by motion or under some other procedure (an "**Alternative Transaction**") without further order of the Court.  The Debtors also seek approval of an initial overbid requirement of $35,000 (the "**Initial Overbid Requirement**"), which would require the Proposed Cash Consideration of any competing bid to be at least $535,000.  The Debtors believe that the Break-up Fee and Initial Overbid Requirement are reasonable, given the benefits to the estate of having the LOI as a definitive agreement and the risk to Imports Dragon that a third-party offer ultimately may be accepted, and that the Break-up Fee is necessary to preserve and enhance the value of the Debtors' estates.  The Initial Overbid Requirement, while incidentally benefiting Import Dragons, is far more beneficial to the Debtors' estate.  The Initial Overbid Requirement of $35,000 provides sufficient funds to pay the Break-Up Fee if a competing bid is accepted and provides a modest increase in the recovery available to the Debtors from the Sale.

22.    The Break-up Fee proposed for Imports Dragon falls well within the range of break-up fees permitted by MLRB 6004-1(c)(2)(B)(i) without prior approval of the Court. MLRB 6004-1 requires prior Court approval for all break-up fees, unless the proposed fee does not exceed the lesser of 5% of the proposed purchase price  or $50,000 "and is subject to final Court approval upon application by the bidder." The proposed $25,000 Break-up Fee satisfies the numeric requirements of MLRB 6004-1, and also the percentage requirements as it is five

---

[4] The LOI refers to a breach of the APA, but since the parties likely will close the Transaction without an APA, the Break-Up Fee should be due and payable if upon a breach of the LOI.

percent (5%) of the Cash Consideration.  The proposed Initial Overbid Requirement also is

within the limits of MLRB 6004-1(c)(2)(B)(ii).

23.     Bidding incentives such as the Break-Up Fee encourages a potential purchaser to

invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary

due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and

uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding

incentives similar to the Break-up Fee under the "business judgment rule," which prescribes

against judicial second-guessing of the actions of a corporation's board of directors taken in good

faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Avenue Assocs. L.P., 96

B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to

convince a 'white knight' to enter the bidding by providing some form of compensation for the

risks it is undertaking") (citation omitted); Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal

dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to

permit such fees in bankruptcy: whether (1) relationship of parties who negotiated break-up fee

is tainted by self-dealing or manipulation; (2) fee hampers, rather than encourages, bidding; and

(3) amount of fee is unreasonable relative to purchase price).

24.     The United States Court of Appeals for the Third Circuit has clarified that bidding

incentives, to be approved, must be shown to be "actually necessary to preserve the value of the

estate" and therefore allowable under section 503(b) as an administrative expense. Calpine Corp.

v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir.

1999) (concluding that the business judgment rule applied in non-bankruptcy transactions did not

override the need to comply with section 503(b)'s standards). O'Brien involved a debtor seeking

to approve a break-up fee with a stalking horse bidder the debtor selected, after an extensive

solicitation of offers, from among five bids (three of which the debtor deemed "highest and

best"). Id. at 529. In that circumstance, the O'Brien court ultimately affirmed the bankruptcy

court's denial of a break-up fee as not providing sufficient value to the estate to satisfy section

503(b). Id. at 537-38.

25.    In the decision, the O'Brien court identified two instances in which bidding

incentives may provide benefit to the estate under different circumstances, both of which exist in

this case. Benefit may be found if "assurance of a break-up fee promoted more competitive

bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited." Id. at 537. Thus, bidding incentives may "encourage a

prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the

prospective bidder that it will receive compensation for that undertaking if it is unsuccessful." Id.

at 535. Second, where the availability of bidding incentives induces a bidder to submit a bid that

serves as a minimum or floor bid "on which other bidders can rely, the bidder may have provided

a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will

reflect its true worth." Id. at 537.

26.    Both of these circumstances exist here.  The Debtors have attempted for months

to solicit a binding offer.  Imports Dragon is the only binding offer that the Debtors have

received.  The submission by Imports Dragon of a binding offer in turn appears to have

stimulated interest by third parties to participate in a sale.   Thus, the proposed Break-Up Fee

"promoted more competitive bidding . . . by inducing a bid that otherwise would not have been

made and without which bidding may have been limited."  Id.  Second, the Break-Up Fee

induced Imports Dragon to submit a bid that serves as a minimum or floor bid "on which other

bidders can rely." Id.

27.     In sum, the ability to offer the Break-Up Fee enables the Debtors to ensure that

the Sale will be to a contractually-committed bidder at a price the Debtors believe to be fair.  At

the same time, this bidding incentive increases the likelihood of a robust Auction and thus the

potential for even greater benefit to the estate.  "Accordingly, the Break-Up Fee should be

approved.

### B.  The Sale is Within the Debtors' Sound Business Judgment

28.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Moreover, section 105(a) of the Bankruptcy Code provides

that bankruptcy courts "may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

29.     A sale under section 363(b)(1) is within the sound business discretion of the

Debtors.  "[A] debtor's business decision should be approved by the court unless it is shown to

be so manifestly unreasonable that it could not be based upon sound business judgment, but only

on bad faith, or whim or caprice." In re Cadkey Corp., 317 B.R. 19, 22 – 23 (D. Mass. 2004)

(quoting In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal quotations and

citations omitted)); In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)).  A

debtor's business decisions are entitled to "great judicial deference." In re WPRV-TV, Inc., 143

B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); see also In re

Thinking Machs. Corp., 182 B.R. 365, 368 (D. Mass. 1995) (emphasizing "the high degree of

deference usually afforded purely economic decisions of trustees"), rev'd on other grounds, 67

F.3d 1021 (1st Cir. 1995).  In considering approval of a debtor in possession's business decision, the court does not act as an arbiter of disputes between creditors and the estate but as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession." Aerovox, Inc., 269 B.R. at 80 (quoting In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993)).  A debtor in possession generally satisfies the business judgment standard if it acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.  See, In re Genesys Research Inst., Inc., No. 15-12794-JNF, 2016 WL 3583229, at *19 (Bankr. D. Mass. June 24, 2016) (quoting In re MF Global, Inc., 535 B.R. 596, 605 (Bankr.S.D.N.Y.2015).

30.    Here, the Debtors acted consistently with these tests.  The Debtors' extensive efforts to solicit bids informed them of what could be accomplished.  The Debtors clearly have acted in good faith. In light of the cash flow needs of the Debtors, and the dim prospects of raising sufficient equity of debt financing to reorganize on a standalone basis, the Transaction is in the best interests of the Debtors.  The Bidding Procedures will expose the Debtor's assets to the greatest number of qualified bidders in the most efficient manner possible.

### C.  Assumption and Assignment of Executory Contracts

31.    The Debtors seek authority to assume and assign to the Winning Bidder the Designated Contracts, if any.  Section 365(f)(2) of the Bankruptcy Code permits the Debtors to assign executory contracts, but only if (A) the Debtors assume such contracts and leases, and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.  Section 365(b)(1) of the Bankruptcy Code in turn codifies the requirements for assuming an unexpired contract or lease, and provides that if there has been a default in an executory contract or unexpired lease, the

Debtors may not assume them unless, at the time of assumption, the Debtors (A) cure, or provide

adequate assurance that the Debtors will promptly cure, such default, and (B) compensates, or

provides adequate assurance that the Debtors will promptly compensate, a party other than the

Debtors for any actual pecuniary loss to such party resulting from such default.

32.    Here, the LOI requires Import Dragons to pay all cure costs required by sections

365 (b)(1) (A) and (B) of the Bankruptcy Code, and to provide the requisite adequate assurance

of future performance.

33.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction."  See, In

re GlycoGenesys, Inc., 352 B.R. 568, 578 (Bankr. D. Mass. 2006); EBG Midtown S. Corp. v.

McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592

(S.D.N.Y. 1992); see also In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla.

1994) ("the degree of assurance necessary falls considerably short of an absolute guaranty");

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1988).  It is appropriate to evaluate the financial condition of the assignee and the likelihood that

the non-debtor party will receive the benefit of its bargain from the assignee.  See GlycoGenesys,

352 B.R. at 578; In re Casual Male Corp., 120 B.R. 256, 264-65 (Bankr. D. Mass. 1990).

34.    Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of lease from debtor has

financial resources and has expressed willingness to devote sufficient funding to business in

order to give it strong likelihood of succeeding).

35.    The Bidding Procedures require competing bidders to provide an acknowledgement and representation that the bidder will assume the obligations of the Debtors under executed contracts and unexpired leases to be assigned and contain the bidder's agreement to pay the related cure costs.  Accordingly, the Debtors submit that the Bidding Procedures will result in the satisfaction of the requirements of section 365 of the Bankruptcy Code with respect to the proposed assumption and assignments of Designated Contracts, regardless of the identity of the Winning Bidder.  Nevertheless, if Imports Dragon is not the Winning Bidder, then the Winning Bidder will be required to provide evidence to the Court at the Sale Hearing of its adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.  In re Bygaph, Inc., supra.

### D.  Authorization for Sale Free and Clear of Interests

36.    Section 363(f) of the Bankruptcy Code provides that a debtor may sell property "free and clear of any interest in such property of an entity other than the estate, only if –

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

37.    The Debtors submit that one or more of these elements is present with respect to the contemplated Sale.  As noted above, there are three secured creditors in this case.  The proposed sale will be free and clear of the secured creditors interests.  With respect to LC, none

23

of the accounts receivable sold to LC as of the Closing Date will be transferred to the Winning

Bidder.  Similarly, LC's reserve account will not be transferred to the Winning Bidder.  The

Debtors believe LC is fully secured, indeed oversecured, by the reserve fund LC holds.  LC's

security interest in the Purchased Assets that will be transferred to the Winning Bidder is in the

nature of additional collateral for LC, and LC's liens will attach to proceeds of this "additional

collateral" with the same priority and validity as LC's existing liens and security interests enjoy

in the Purchased Assets.  With respect to Mr. Hanssmann, he consents to the Sale, and thus a sale

free and clear of those security interests pursuant to section 363(f)(2) of the Bankruptcy Code.

38.    The asserted lien of the Mars is subject to *bona fide* dispute, and thus the molds

on which Mars asserts a lien may be sold free and clear of Mars's alleged lien pursuant to section

363(f)(4).  The purpose behind section 363(f)(4) is to permit the debtor to sell property free and

clear of disputed interests, "so the liquidation of the assets [is] not unnecessarily delayed while

the disputes are being litigated." In re Robotic Vision Sys., 322 B.R. 502, 506 (Bankr. D.N.H.

2005) (citing Moldo v. Clark (In re Clark), 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)).

"Typically, the proceeds of sale are held subject to the disputed interest and then distributed as

dictated by the resolution of the dispute; such procedure preserves all parties' rights by simply

transferring interests from property to dollars that represent its value." Clark, 266 B.R. at 171.

39.    The statute does not define "bona fide dispute," but that same term does appear

elsewhere in Bankruptcy Code section 303. Numerous cases have adopted the section 303

standard in applying section 363(f)(4), concluding that a bona fide dispute exists for section

363(f)(4) purposes if "there is an objective basis for either a factual or legal dispute as to the

validity of the asserted interest." In re Taylor, 198 B.R. 142, 162 (Bankr. D.S.C. 1996). See also

In re L.L. Murphrey Co., Case No. 12-03837, 2013 Bankr. LEXIS 2318 at *12 (Bankr. E.D.N.C.

June 6, 2013); In re NJ Affordable Homes Corp., Case No. 05-60442, 2006 Bankr. LEXIS 4498

at *41 (Bankr. D.N.J. June 29, 2006); In re Octagon Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill.

1991) (adopting section 303 standard from In re Busick, 831 F.2d 745, 750 (7th Cir. 1987)).

    40.    The First Circuit Court of Appeals has not adopted a formal standard for

analyzing "bona fide disputes" under section 303 or 363(f)(4), but other courts in the First

Circuit, including this Court, have applied a similar standard in section 303 cases. See Metz v.

Dilley (In re Dilley), 339 B.R. 1, 6 (B.A.P. 1st Cir. 2006) (adopting objective section 303 "bona

fide dispute" standard used in other Circuits; a bona fide dispute exists "if there is either a

genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as

to the application of law to undisputed facts") (Hillman, Rosenthal, and Somma, JJ.); In re Lever

Dev., LLC, Case No. 11-44639, 2012 Bankr. LEXIS 4900 at *19-20 (Bankr. D. Mass. Oct. 18,

2012) (same) (Hoffman, J.).

    41.    In evaluating whether a factual or legal dispute as to the validity of the asserted

interest exists under section 363(f)(4), some factual grounds must be provided to show there is an

objective basis for a dispute. See, e.g., Octagon, 123 B.R. at 590; In re Collins, 180 B.R. 447,

452 (Bankr. E.D. Va. 1995). The court need not, however, determine "the probable outcome of

the dispute, but merely whether one exists." Octagon, 123 B.R. at 590; Collins, 180 B.R. at 452.

C.f. Dilley, 339 B.R. at 6 ("The bankruptcy court is not to *resolve* any genuine issues of fact or

law; its inquiry is to determine if such an issue exists.") (emphasis in original).  Further, the

dispute "does not necessarily have to be the subject of an immediate or concurrent adversary

proceeding." In re Collins, 180 B.R. at 452 n.8. See also, Union Planters Bank, N.A. v. Burns (In

re Gaylord Grain L.L.C.), 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004).

42.      Here a *bona fide* dispute exists among the Debtors and Mars.  Mars asserts it is

owed $71,913.24 for goods sold and delivered and $59,350.91 for goods specially manufactured

less a credit in the amount of $28.04, leaving a grand total of $131,236.11.  However, in 2016

Mars and the Debtors entered into a settlement agreement (the "**Mars Agreement**"), a copy of

which is attached as **Exhibit E**.  Pursuant to the Mars Agreement, the parties stipulated that the

debt owed as of June 5, 2016 was $189,461.15.  OYO Sportstoys made approximately $120,000

of payments prepetition towards this debt, resulting in the $71,913.24 figure Mars asserts is

owed for goods sold and delivered.  In point of fact, that amount is, at most, the amount owed as

of the Oyo Sportstoys Petition Date on account of the Mars Agreement.

43.      Mars provided the Debtors with a complete release of all debt as of the date of the

agreement (it appears to be June 20, 2016).  All of the $59,350.91 claimed owed for specially

manufactured goods was released by the settlement agreement, as all of that debt arose prior to

the effective date of the release in the Mars Agreement.  Thus, the $59,350.91 figure constitutes

"double counting" as it was released by Mars in the Mars Agreement.

44.      Even the $71,913.24 figure overstates the amount of Mars's claim.  The Debtors

have paid approximately $18,000 on account of the amounts owed under the settlement

agreement.[5]  The balance owed to Mars is reduced to approximately $53,000 after deduction for

these payments.

45.      None of this amount is secured by a statutory lien.  Mars asserts it has a lien on

OYO Sportstoys' molds in Mars's possession pursuant to RI Gen Law §34-30.1-1.  That statute

---

[5]  The $18,000 of payments were made after the OYO Sportstoys Petition Date without the knowledge of the undersigned counsel for OYO Sportstoys, and therefore OYO Sportstoys did not obtain court approval to make these postpetition payments to Mars.  Through counsel, OYO Sportstoys and Mars are in discussions to resolve these inadevertent and unauthorized postpetition payments to Mars.

provides that "Molders shall have a lien on all dies, molds, forms or patterns in their possession

belonging to a customer, for the balance due them from such customer for any manufacturing or

fabrication work and the value of all material related to such work. The molder may lawfully

retain possession of the die, mold, form or pattern until the debts are paid." The Mars Agreement

substituted the "Settlement Payment" (the amounts paid to Mars for the stipulated debt) for the

amounts due for the manufacturing work that was the compromised by the settlement agreement

(see, for example,  first paragraph on page 2 of Settlement Agreement, whereby Mars elected to

receive the "Settlement Payment" in full satisfaction of its claim).  In short, because Mars is

owed money, if at all, pursuant to a contract, the statute providing a lien to molders for

"manufacturing or fabrication work" is inapplicable.  Thus, any claim allowed to Mars is at most

a general unsecured claim.

46.    The Debtors submit they have provided enough to demonstrate that a *bona fide*

dispute exists with Mars, sufficient to enable the Debtors to sell the assets in the Transaction free

and clear of Mars's alleged statutory lien pursuant to section 363(f)(4) of the Bankruptcy Code.

### E.  Compliance with MLBR 6004-1(a)(1)(A)

47.    MLBR 6004-1(a)(1)(A) provides that "if all or substantially all of a chapter 11

debtor's assets are to be sold, the motion shall state why the sale is proposed under 11 U.S.C. §

363 rather than through a chapter 11 plan and shall contain a practical and abbreviated equivalent

of the adequate information required in a disclosure statement to a chapter 11 plan."  First, the

Motion should be found to satisfy this requirement and constitute "a practical and abbreviated

equivalent of adequate information required in a disclosure statement."  Second, the reason the

Sale is occurring through the Sale is because Imports Dragon wants to acquire the Purchased

Assets as soon as possible, and the Debtors wish to sell the Purchased Assets as soon as possible

27

to relieve themselves of the cash flow demands continued operations imposes on them. The Transaction contemplates a chapter 11 plan will follow. It is through the chapter 11 plan that Imports Dragon will acquire all of the Debtors' rights, including rights not sold to the Debtors pursuant to the LOI and applicable law, such as the Information. Alternatively, because the Information will not be sold to Imports Dragon pursuant to the Sale, the Sale does not constitute a sale of all or substantially all of the Debtors' assets.

WHEREFORE, the Debtors pray that the Court allow this Motion, and

a. Enter the Bidding Procedures Order, (i) authorizing the bidding procedures to be employed in connection with the Transaction with the Winning Bidder, (ii) approving the LOI in connection with a higher or better offer at the Auction, (iii) approving the Initial Overbid Requirement, (iv) authorizing the Break-Up Fee to Imports Dragon, (v) establishing definitive deadlines as requested above, (vi) approving the form and manner of notice of the Motion and any hearing on the Motion;

b. At the Sale Hearing, enter the Sale Order; and

c. Awarding the Debtors such other and further relief to which they may be entitled.

Dated:  February 15, 2018

OYO SPORTS, INC.,
By its attorneys,

*/s/ Jeffrey D. Sternklar*
Jeffrey D. Sternklar (BBO #549561)
JEFFREY D. STERNKLAR LLC
26th Floor
225 Franklin Street
Boston, Massachusetts 02110
Tel:    (617) 396-4515

28

Cell:    (617-733-5171
Fax:    (617) 507-6530
Email: jeffrey@sternklawlaw.com

OYOTOYO, INC.,
By its attorney,


/s/ Herbert Weinberg
Herbert Weinberg (BBO #550415)
Rosenberg & Weinberg
805 Turnpike Street
North Andover, MA  01845
Tel:    (978) 683-2479
E-mail: hweinberg@jrhwlaw.com


## CERTIFICATE OF SERVICE

I, Jeffrey D. Sternklar, hereby certify that on the 15th day of February, 2018, I caused

copies of the foregoing document to be served on the persons and entities listed below, in the

manner indicated:

*VIA ECF:*

- **Joseph M DiOrio**    jmdiorio@dioriolaw.com, ghpalmer@dioriolaw.com
- **Richard King**    USTPRegion01.WO.ECF@USDOJ.GOV
- **Adam J. Ruttenberg**    aruttenberg@pbl.com
- **Peter N. Tamposi**    peter@thetamposilawgroup.com, Judy@tlgnh.com
- **Lisa D. Tingue**    lisa.d.tingue@usdoj.gov
- **Herbert Weinberg**    hweinberg@jrhwlaw.com,
  bmessina@jrhwlaw.com,herbweinberglaw@gmail.com

*VIA ELECTRONIC MAIL*

- **Valerie Bantner-Peo, Esq. (**vbantnerpeo@buchaler.com**)** (Liquid Capital Exchange, Inc.)
- **Alexander N. Wright, Esq. (**awright@ashenlaw.com **)** (First Midwest Leasing)
- **Mr. John R. Gerba (**jgerba@nhlpa.com **) (NHLPA)**
- **John A. Gagliardi. Esq. (**jgagliardi@wgflaw.com **)** (RBA Leasing)
- **Scott Fink, Esq. (**sfink@weltman.com **) (**Toyota Equipment Leasing)

- **Douglas Rosner, Esq. ([drosner@goulstonstorrs.com](mailto:drosner@goulstonstorrs.com))**

*VIA FACSIMILE*

- *Internal Revenue Service  (BY FACSMILE - 617-316-2605)*
  *P.O. Box 7346*
  *Philadelphia, PA 19101-7346*

- 
- *Massachusetts Department of Revenue (BY FACMILE 617-660-9886)*
  *Attn.:  Ms. Kendra Ye*
  *Bankruptcy Unit*
  *P.O. Box 9564*
  *Boston, MA 02114-9564*

/s/ *Jeffrey D. Sternklar*
Jeffrey D. Sternklar